IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MICHELE WHITE,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | C.A. No. __4:17-cv0403_ |
| V. | § | |
| | § | |
| **LIFETIME FITNESS, INC.** | § | |
| | § | |
| Defendant. | § | (JURY TRIAL DEMANDED) |

## ORIGINAL COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW Plaintiff, Michele White, filing her Original Complaint complaining of Defendant, Lifetime Fitness, Inc. and in support thereof would show as follows:

### I.   JURISDICTION, PARTIES AND VENUE

1. This Court has jurisdiction over the causes of action alleged by Plaintiff pursuant to 42 U.S.C. §1981 ("Section 1981"), as amended and its anti-retaliation regulations.

2. Plaintiff Michele White ("Ms. White" or "Plaintiff") resides in Katy, Fort Bend, Texas.

3. Ms. White is African-American and is protected by 42 U.S.C. §1981 and, at all relevant times to the facts within this Complaint, Ms. White was an employee of the Defendant as that term has been defined under Section 1981.

4. Defendant, Lifetime Fitness, Inc. conducts business within Texas and may be served with this Original Complaint by and through its registered agent for service National Registered Agents, Inc., 1999 Bryan Street, Suite 900, Dallas, Texas, 75201.

5. The employment practices alleged to be unlawful herein were committed within the Southern District of Texas, Houston Division. Venue is appropriate in this Court.

1

6.  <u>Vicarious Liability Respondeat Superior</u>:  Whenever in this pleading it is alleged that Defendant did any act or thing, or failed to do any act or thing, it is meant that Defendant's officers, owners, servants, employees, or representatives including but not limited to Scott Baumgardner, Qadir Muhammad, Chris Anderson, and other individuals within Defendant's management and/or human resource did such act or thing, or failed to do such act or thing, or that such act or thing or omission was done in the course and scope of that person's employment with Defendant Lifetime Fitness, Inc., or in the furtherance of Defendant's interests, or with the full authorization, permission, tolerance, and/or ratification of Defendant, or was done by an authorized member of management of Defendant Lifetime Fitness, Inc. or was done in the normal routine of the accepted, tolerated, or permitted conduct, customs, and/or practices of Defendant Lifetime Fitness, Inc., its officers, owners, servants, employees, and/or representatives.

## II.   FACTUAL BACKGROUND

7.  Ms. White began her employment with Defendant in 2012.  Initially, Defendant hired Ms. White to work as a Group Fitness Instructor but by February 2015, Defendant had promoted Ms. White to Group Fitness Assistant Manager with a complete new set of duties and responsibilities.

8.  Despite Ms. White's new role and promotion, Defendant desired for Ms. White to maintain her position as Group Fitness Instructor, and she did.

9.  So for the first two and a half years, Ms. White had two positions at Lifetime Fitness; fitness instructor and group fitness assistant manager.  In 2015, Defendant offered Ms. White another promotion, a salaried position as Kids Activities Manager, which Ms. White accepted.

10. After the 2015 promotion, however, Ms. White held three positions at Lifetime Fitness: Group Fitness Instructor, Group Fitness Assistant Manager, and Kids Activities Manager.

11. With Ms. White promotions, her job duties increased and so did her work hours. Prior to Ms. White's promotion to Kids Activity Manager, Ms. White worked approximately twenty to twenty five hours per week. After her promotion, Ms. White's hours increased to approximately seventy hours per week.

12. Despite the long hours, Ms. White—who, in 2013, obtained her group fitness certification from the American Council on Exercise and her cycling certification from Schwinn Fitness—was the most popular cycle instructor at Defendant's Katy, Texas location following her promotion in 2015.

13. For example, after Ms. White obtained her cycling certification, she would often have to turn gym members away because her classes would fill up so quickly. For another example, in 2015, the National Indoor Cycle Manager made her a regional indoor cycling mentor. In this position, Ms. White was responsible for quality control and for evaluating instructors in the Houston region.

14. Undisputedly, during this period, Ms. White's performance with Defendant was exceptional. Ms. White's promotions and evaluations reflected such.

15. Despite the increases in Ms. White's responsibility and certification, and despite Ms. White's own professional successes, Defendant was suffering through its own growing pains. In 2015, management within Lifetime Fitness had begun to drastically change and Ms. White general manager was replaced with Scott Baumgardner (white) and area director Qadir Muhammad (black).

16. Ms. White worked well with Mr. Baumgardner, however, from her very initial meeting with Mr. Muhammad, Ms. White noticed that Mr. Muhammad had a harsh manner of dealing and interacting with the employees he supervised.

17. Ms. White and other employees observed that Mr. Muhammad was especially critical and intimidating to ~~black~~ non-white female employees who spoke up or posed questions to him. So much so, that Ms. White was disheartened by Mr. Muhammad and his discriminatory management style. On one occasion, for example, Ms. White noticed Mr. Muhammad reprimanding Sonia Garza for speaking up and voicing her opinion. Mr. Muhammad also referred to the Kids Manager at the Sugarland location, Maliena Mack (black, female) as "headstrong." In addition, he suggested she should be more submissive and "wait her turn when men are speaking."

18. So, in addition to the long hours Ms. White had begun working as a result of her new role, the stress of Mr. Muhammad's discriminatory management style began to take a toll on Ms. White both physically and emotionally.

19. Ultimately, because of the hostile work environment and the long work hours, Ms. White decided to resign from the Kids Activities Manager position. She did not wish, however, to resign her positions as Group Fitness Instructor or Assistant Manager. Ms. White believed that, in those two roles, she would not have as much interaction with Mr. Muhammad as the salaried management role. Further, Ms. White had worked the other two positions for approximately three years without issue.

20. In line with her decision, on April 12, 2016, Ms. White submitted a letter to Lifetime Fitness' management team explaining her decision to remain in two roles *only*: fitness instructor and assistant manager.

21. After submitting her letter, Gene Smith, Director of Club Improvement, asked Ms. White not to resign from the manager position and to reconsider her decision. Mr. Smith acknowledged that Ms. White was a top performing manager and someone who had positively impacted Defendant's Katy, Texas' gym membership.

4

22. Ms. White declined Mr. Smith's offer but told Mr. Smith that she would stay in the Kids Activity Manager position until Defendant could find a replacement.

23. In contrast to Mr. Smith, Mr. Muhammad (who was in Ms. White's direct line of management) said absolutely nothing to Ms. White about her decision to resign as manager. In fact, Mr. Muhammad, who had recently attended a Club Improvement Group Summit where it was stressed that management should show and have care and concern for its employees in order for each Lifetime Fitness location to be successful, showed no care or concern to Ms. White at all.

24. Instead in the face of management's recent commitment to show such care and concern for its employees, Mr. Muhammad's silence about Ms. White's resignation spoke volumes. Yet, Mr. Muhammad's silence was simply in line with all his behavior toward Ms. White, which consistently demonstrated that he did not value black employees such as Ms. White.

25. Shortly after Ms. White had submitted her letter resigning from her management position, on July 6, 2016, Ms. White's direct supervisor Sonia Garza was terminated from her position as the Group Fitness Manager, and Defendant hired a new general manager, Chris Anderson.

26. As Group Fitness *Assistant* Manager, Ms. White sent an email to Mr. Muhammad, asking him why he didn't solicit her help during Ms. Garza's termination (which was standard procedure), to which Mr. Mohammed replied, "[y]ou have your hands full with summer camp."

27. A few days later, on July 11th, Ms. White planned to teach her regularly scheduled indoor-cycle class. To her dismay and to the dismay of several gym members, Ms. White discovered her class had been canceled at some point earlier that day without her knowledge.

28. After several members had approached Ms. White and complained about the class cancellation, Ms. White approached (new) general manager, Chris Anderson, and emailed Mr.

5

Muhammad asking about the unexpected cancellation. Although class cancellations can only be executed by authorized team members, Ms. White was not given an explanation for the cancellation. Instead, at Mr. Anderson's request, she agreed to teach the class to the eight members that had complained about the cancellation.

29. On July 13, Ms. White returned to the gym, again prepared to teach class, however, her new general manager, Chris Anderson, advised her that "her resignation had been accepted and that her employment was terminated," effective immediately. Mr. Anderson provided Ms. White with no explanation or reason for her termination.

30. Of course Ms. White was shocked. She had been an outstanding, loyal employee of Defendant for over four years. Ms. White told Mr. Anderson that she had not resigned her positions as fitness instructor or assistant manager and that she did not understand why she was being told that her "resignation had been accepted" or that her employment was being terminated.

31. Without question, however, the direction to force Ms. White's termination could not be made without Mr. Muhammad's authority, who undoubtedly would have made these decisions concerning Ms. White by unlawfully considering her race.

32. Moreover, Ms. White had worked with Mr. Muhammad long enough to know that (1) he did not like being questioned by black employees (which she had done on July 6th and 11th) and (2) his treatment toward black employees has always been particularly harsh.

33. In fact, Mr. Muhammad has never before terminated a white employee whose performance compared to Ms. White. Ms. White performance at her job was outstanding and management told her so. More than that, for white employees who were underperforming, Mr. Muhammad would not terminate them; rather he placed them on performance improvement plans, transferred their gym location, and/or demoted them. Ms. White is the single employee he has flat-out terminated.

34. Under Mr. Muhammed's management, underperforming white employees such as Scott Baumgardner and Kathleen White were allowed to keep their position but were transferred to other locations for a fresh start. Underperforming employee Chris McKay (white) was demoted and allowed to stay employed at the Katy location.

35. In contrast, black outstanding employee Michele White was terminated without cause. This is so even though Ms. White's received glowing evaluations throughout her employment with Defendant; was a member of Defendant's team that was awarded the Artistry Award in two consecutive years; and helped to increase Defendant's membership.

36. Simply put, Ms. White (black) was terminated without cause and was not provided the same employment opportunities her white counterparts were afforded.

37. Ms. White was subjected to different treatment as Defendant's employee than Defendant's white employees, discriminated against and ultimately terminated because of her race (African-American) in violation of Section 1981, as amended.

### III.   CAUSE OF ACTION

### RACE DISCRIMINATION PURSUANT TO 42 U.S.C. §1981

38. Plaintiff repeats and re-alleges by reference each and every allegation contained in the paragraphs 6 through 36 above and incorporates the same herein as though fully set forth.

39. Defendant, through its agents, supervisors, or employees violated Plaintiff's civil rights in violation of 42 U.S.C. §1981 by intentionally interfering with Plaintiff's employment because of her race.

40. This intentional interference consisted of discrimination of a continuous nature.

41. Defendant, through its agents, supervisors, or employees discriminated against Plaintiff, which led to the loss and impairment in whole or part, of the wages, benefits, promotions, privileges, opportunities and/or terms and conditions of Plaintiff's employment.

7

42. The above-described acts on Defendant's part were committed with actual malice and/or in reckless disregard of Plaintiff's federally protected civil rights.

43. The above-described acts on Defendant's part caused Plaintiff substantial injury and damage.

### IV.   JURY DEMAND

44. Plaintiff requests that this action be heard before a jury.

### V.   DAMAGES

45. Defendant's conduct constitutes violations of statutory and/or common law. Such unlawful conduct seriously affected Plaintiff in her occupation. Because of Defendant's unlawful conduct, Plaintiff has suffered, suffers, and will continue to suffer financial loss, humiliation, mental anxiety and stress, and other damages. Plaintiff has suffered direct injury as a proximate result of the unlawful discriminatory practices, policies and procedures of Defendant. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages in an amount to be proved at trial.

46. Because of Defendant's unlawful and tortious conduct, it has been necessary for Plaintiff to retain the undersigned attorney to represent her in these causes of action Plaintiff has agreed to pay her attorney reasonable attorney's fees for the preparation and trial of these causes, and further for any appeal thereof should same become necessary.

47. Additionally, Plaintiff has incurred out-of-pocket expenses, which include litigation costs and other expenses to preserve her ability to earn a living. Accordingly, Plaintiff seeks all general, special, incidental and consequential damages as shall be proven at trial.

48. Further, Plaintiff seeks pre-judgment interest at a rate commensurate with the actual rate of interest in the marketplace or, alternatively, the statutory rate of interest because of the delay in receiving the damages and to avoid unjust enrichment to Defendant. Plaintiff also seeks

post-judgment interest at the maximum rate allowed by law in the event that Defendant does not promptly tender damages assessed against them and to avoid unjustly enriching Defendant.

## VI. PRAYER

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have judgment against Defendant for:

a. Permanent injunction enjoining Defendant, its agents, successors, employees, and those acting in consort with Defendant from engaging in any employment practice which discriminates on the basis of race;

b. All damages to which Plaintiff may be entitled pursuant to this Original Complaint, or any amendment(s) thereto, including but not limited to back pay, reinstatement or front pay in lieu of reinstatement, loss of earnings in the past, loss of earning capacity in the future, loss of benefits in the past, loss of benefits in the future, statutory relief at law, and equity;

c. Compensatory damages for pain and mental suffering in the past and future;

d. Punitive damages in an amount above the minimum jurisdictional limit of the Court;

e. Reasonable attorney's fees, with conditional awards in the event of appeal;

f. Pre-judgment interest at the highest rate permitted by law;

g. Post-judgment interest from the judgment until paid at the highest rate permitted by law;

h. Costs of court and expert witness fees incurred by Plaintiff in the preparation and prosecution of this action; and

i. Such other and further relief, at law or in equity, to which Plaintiff may be entitled, whether by this Original Complaint or by any amendment hereto.

 Respectfully submitted,

The Murphy Law Practice, PLLC

/s/  *Marjorie A. Murphy*
_____

Marjorie A. Murphy
Attorney-in-Charge
State Bar No. 24013218
S.D. Bar No. 34512
3355 W. Alabama, Ste. 670
Houston, Texas  77098
Telephone:  (832) 564-3804
Facsimile:  (832) 553-7441
Email: marjorie@themurphylawpractice.com

**ATTORNEY FOR PLAINTIFF**
MICHELE WHITE